Juyoun Han, Esq.
Eric Baum, Esq.
Ayo Alston-Moore, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
jhan@eandblaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------

MICHAEL MCLEER
(a.k.a. MICHAEL KAVES),
individually and on behalf of a class of all others
similarly situated,

        Plaintiff,

    v.

NEW YORK CITY POLICE DEPARTMENT;
CITY OF NEW YORK

        Defendants.

------------------------------------------------------------

**Civ. No. 21-3093**

**COMPLAINT**
**[CLASS ACTION]**

 

**"The purpose of art is washing the dust of daily life off our souls."**

**-Pablo Picasso**

Individual and Representative Plaintiff, Michael McLeer (also known as "KAVES," otherwise referred to as "Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, EISENBERG & BAUM, LLP, hereby states his Complaint against Defendants New York City Police Department and the City of New York (collectively, Defendants):

## BACKGROUND

1.      This is an action brought by an internationally recognized visual artist Michael McLeer, in which he individually, and on behalf of a class of all similarly situated artists, seeks relief for various federal and state law violations, including (1) violation of the Visual Artists Rights Act pertaining to a willful destruction of a work of visual art and (2) violation of civil rights under 42 U.S.C. § 1983 arising from deprivation of free speech rights and property interests without due process of law.

2.      Under Section 145.60 of the New York Penal Code, making graffiti without the permission of the owner or operator is a misdemeanor crime: "No person shall make graffiti of any type on any building, public or private, or any other property real or personal owned by any person, firm or corporation or any public agency or instrumentality, without the express permission of the owner or operator of said property."

3.      This case is about the NYPD's attack on graffiti and street art that endangers hundreds of valuable, recognized, and permitted artworks across the five boroughs. It is about the NYPD's haphazard coordination of the "graffiti clean up campaign" that enlisted volunteer members of the community and was heralded in the media as a so-called collaboration to build trust between public and the NYPD. In reality, upon information and belief, the City lacked the budget to undertake the cleanup which they sought to fill by recruiting untrained volunteers, the

NYPD failed to investigate the basis of "tips" they received through an ad hoc email account, failed to inquire about the permitted status of the artwork to property owners and operators, and made on-the-fly judgments about which artworks to target for the cleanup. Using an undiscerning eye and an obtuse brush, the untrained crew went out to blot out art from street canvases. As a result, the City and the NYPD has permanently destroyed valuable and recognized artwork and trampled on the reputation and rights of artists under the Visual Artists Rights act and under the Constitution.

4.      Criminalization and the law enforcement's 'war against graffiti' has a blemished history, one that involves violence and out-of-proportion punishment as demonstrated in the death of graffiti artist Michael Stewart in 1983.[1] Under the 'broken windows' law enforcement theory back in the 80s, street art -- in blanket fashion -- was equated with vandalism, graffiti, and social decay.[2]

5.      Today, street art as a genre has gained much recognition and appreciation within the art community and the public community. Examples of such recognition include the current and recent exhibits of graffiti and street artists in the Brooklyn Museum *KAWS: What Party* (2021)[3], and the Guggenheim Museum, *Basquiat's "Defacement," the Untold Story* (2019).[4]

6.      Courts have upheld the rights of street artists' rights in lawsuits arising under the Copyright Act and the Visual Artists Rights Act of 1990, most prominently in the case of *5Pointz*,

---

[1] *'It Could Have Been Me': The 1983 Death Of A NYC Graffiti Artist*, NPR (2013), https://www.npr.org/sections/codeswitch/2013/09/16/221821224/it-could-have-been-me-the-1983-death-of-a-nyc-graffiti-artist
[2] Assaf, Katya & Schnetgoeke, Tim. (2020). *Reading the Illegible: Can Law Understand Graffiti*?. Connecticut Law Review. 53.
[3] *KAWS: What Party*, Brooklyn Museum, https://www.brooklynmuseum.org/exhibitions/kaws_what_party
[4] *Basquiat's "Defacement": The Untold Story*, https://www.guggenheim.org/exhibition/basquiats-defacement-the-untold-story

tried and decided in favor of the street artists within this very courthouse.[5]

7.      Because the law continues to condemn unpermitted artworks as a criminal offense, graffiti writers find themselves in a precarious position being precluded from exercising their rights under the law for fear of being criminally condemned for creating art. For instance, the artist REVOK was subject to 180 days of imprisonment for vandalism while his works were exhibited and celebrated at the Museum of Contemporary Art in Los Angeles.[6] The apparent mismatch between the concepts of criminal justice, artistic creation, and copyright law not only subjects artists to arbitrary law enforcement, but it also exacerbates the chilling effect on artists' rights to enjoy the protection of free speech and property rights.

8.      Examples of other cities where graffiti has been legalized in public spaces and protected as cultural heritage urges New York City to reflect and reform laws that criminalizes graffiti. That said, it must be made clear: this case does NOT focus on illegal artwork. Doing so would too easily allow the City and the NYPD to shift the focus from their illegal acts to that of the artists.

9.      Instead, this case deliberately focuses on the NYPD's illegal conduct demonstrated by their failure to discern, investigate, or notify the owners and creators of authorized, legally permitted street artworks. This case is about the NYPD's lack of training about art, copyrights, and the value of art on the urban scape. This case challenges the NYPD's obtuse conduct, policy, and rhetoric that undermines all street art as 'litter' that needs to be cleaned up. The described conduct of the NYPD constitutes a de jure and de facto violation of the Visual Artists Rights Act

---

[5] *Cohen v. G & M Realty L.P.*, 988 F. Supp. 2d 212 (E.D.N.Y. 2013)
[6] Assaf, Katya & Schnetgoeke, Tim. (2020). *Reading the Illegible: Can Law Understand Graffiti?*. Connecticut Law Review. 53 at 8.

and the Constitution.

10.     Plaintiff seeks an order from this Court for monetary damages, punitive damages, injunctive and declaratory relief. In particular, the Plaintiff demands that the "graffiti clean up" campaign be immediately stopped, and that the Defendants' policies regarding graffiti destruction be subject to public hearing and review which includes members of the public and of the art community. Plaintiff seeks a declaratory relief from this Court declaring that the acts and conduct of the Defendants engaging in graffiti cleanup is illegal. Plaintiff demands compensatory damages (statutory and/or actual) for the destroyed artworks and loss of property interests in the copyright of the art, and punitive damages for the reckless and willful conduct of the polices.

## JURISDICTION & VENUE

11.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of constitutional and civil rights of Plaintiff and Plaintiff Class.

12.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

13.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

14.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391 (a), (b) and (c). A substantial part of the acts and omissions giving rise to Plaintiff's claims has occurred in the Eastern District of New York. Defendants have been and are continuing to commit the acts alleged herein in the Eastern District of New York.

15.     Pursuant to N.Y.S. General Municipal Law § 50(e), a Notice of Claim was served upon the appropriate parties for the City of New York on May 25, 2021, and the Office of the Comptroller assigned claim receipt number 202100083967 thereto.

## THE PARTIES

16.     Plaintiff Michael McLeer brings action as an individual residing in Brooklyn, New York.

17.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York. Upon information and belief, and at all times hereinafter mentioned, the City is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

18.     Upon information and belief, and at all times hereinafter mentioned, Defendant NEW YORK CITY POLICE DEPARTMENT ("NYPD") is a law enforcement entity promulgated and existing pursuant to New York City Charter - having its principal place of business in the City of New York, State of New York.

19.     Upon information and belief, and at all times hereinafter mentioned, Defendants JOHN DOES #1-#100 are duly employed police officers of the NYPD who have been involved in destroying works of visual art as part of the NYPD's "Graffiti Cleanup."

## STATEMENT OF FACTS

*About the Artist, Kaves*

20.     Plaintiff is an artist of international reputation and standing, known for his graffiti, street art, hip-hop, and film making. Plaintiff is better known to the world by his moniker, "Kaves."

21.     Kaves began developing and showing his precocious artistic talent at the age of 12.

As a teenager, Kaves painted murals with permission from the NYC Parks Department, and has contributed to various public art projects within the city's public grounds, including two schools. Kaves was educated and trained at the School of Visual Arts.

22.      Kaves is considered by many as a legendary artist in New York City. Kaves has gained critical acclaim and recognition from his neighborhood in Southwest Brooklyn to international audiences, including Japan. His paintings have appeared on streets, in trains, in museums, and in galleries.

23.      As a highly sought-after street artist and trend forecaster, Kaves has designed exclusive visuals for international brands such as Jaguar, Aston Martin, Audemars Piguet, NIKE, Rockstar Games, WWE, PONY, MTV, ADIDAS, Museum of Modern Art, Van's Warped Tour, Georges Duboeuf (for whom he created the label for 2011 Beaujolais Nouveau) and many others. Kaves has also created logos and graphics for world-renowned artists such as the Beastie Boys and Metallica. In 2019, Kaves collaborated with the legendary rock band Metallica as the illustrator of the book, "The ABCs of Metallica," authored by Metallica.

24.      Kaves' artwork has been published in books including Henry Chalfant's pioneering 1984 chronicle Spraycan Art, Burning New York, Mascots & Mugs: The Characters and Cartoons of Subway Graffiti, Fresh Paint NYC, Graffiti Planet 2 and Piecebook: The Secret Drawings of Graffiti Writers.  His own premier book, "Skin Graf: Masters of Graffiti Tattoo," was released on April 25, 2013 through Prestel Publishing, one of the most prominent publishers in the art field. Kaves' paintings have been shown everywhere from the MTV Real World: Brooklyn Loft to the Gunter Sachs Museum of Fine Arts in Germany, The Blackstone Hotel in Chicago, Illinois, and the Rock and Roll Hall of Fame in Cleveland, Ohio.  His New York City solo show during the summer of 2011 at the Hionas Gallery garnered overwhelming critical acclaim among collectors.

25.     Kaves' work is intrinsic to the historical fabric of Brooklyn. From his youth writing graffiti, to his years of songwriting and performing hip hop, to the current era, Kaves has often addressed his personal tragedies and joys of urban life and related them as part of the greater narrative of the city resonating with many fans in New York City and beyond.

*About the Artwork, Death From Above*

26.     Kave's artwork Death From Above ("Mural") was an approximately 12 ft. x 30 ft mural located on the corner of 95-97 Bridge Street and 157 York Street, Brooklyn, NY, 11201.



**Death from Above (Kaves & Collaborator, Street Mural and Sculpture, 2008-2021)**
**(Photo Credit: Wally Gobetz)**

27.     The Mural was created on or about August 12, 2008. The Mural is a combination of painting and sculpture, marking a signature collaboration between Kaves and a collaborator.

28.     Plaintiff has registered for, and owns, copyright over the Mural.

29.     The Mural was authorized by the owner of the wall on which the Mural had existed

8

for more than 13 years. It was also agreed upon and well-liked by the tenant of the property.

30.     The site where the Mural was located used to be a dilapidated wall. Plaintiff's intent was to paint a colorful mural to brighten up the corner and enhance the community and property's visual appeal. The Mural was a dedication to Kaves' and the collaborator's mothers, both of whom passed away. "Death From Above" was also the name of the sculpture placed on top of the mural.

31.     The Mural received significant media attention and was featured in various TV shows, movies, and advertisements including but not limited to:

      a.   Book: Graffiti Planet 2 (Michael O'Meara Books Limited 2009)

      b.   Book: Graffiti 365 (Abrams 2011)

      c.   BET TV show: The Rundown with Robin Thede

      d.   CBS TV Series: "Elementary" (2017)

      e.   Hyundai Motor Company Advertisement: Genesis 2018 Campaign (print and digital)

32.     As the copyright holder of the Mural, Kaves is entitled to licensing fees for the use of the Mural. A single licensing agreement to use this Mural would range above $9,000.

33.     Many of Kaves' artworks that are currently on sale exceed $150,000 in sales price.

34.     The Mural has gained consistent attention from commentators and the public alike, generating appreciation from crowds including on social media platforms.

*Other Artworks by Kaves*

35.     Kaves has painted other murals on walls around the City for the benefit of the public. For example, Kaves and another artist collaboratively painted a portrait "Donna and Michele Mural," depicting Kaves' 43-year-old mother and 4-year-old sister, at 92nd St. and Fort Hamilton Parkway which is where a fatal car accident claimed their lives more than 20 years ago.

In gifting this work to the public, Kaves expressed that he "hopes the mural will serve as a reminder to drivers [to drive safely]." This work received ample media attention, and the Daily News reported that the owner of the wall on which the mural is painted "gladly agreed to the project."[7]



**Donna & Michele (Kaves, Street Mural, 2014)**

---

[7] Brooklyn Graffiti Artist Paints a Portrait where his Mother and Sister Died (July 13, 2014), NY DAILY NEWS, https://www.nydailynews.com/new-york/brooklyn/picture-grief-article-1.1863835

36.     There are other murals created by Kaves that still exist within the City including but not limited to:

      a.   Santo Mural: 13th Ave & Bay Ridge Ave, Brooklyn, NY

      b.   HoBrah Mural #1: 412 Forest Ave 10301, Staten Island, NY 10301

      c.   HoBrah Mural #2: 31 New Dorp Plaza, Staten Island, NY 10306

      d.   PS/IS 104 School Mural: 92nd Street & 5th Ave, Brooklyn, NY 11209

      e.   LES School Mural:440 Ovington Ave, Brooklyn, NY 11209

37.     All of the above-mentioned murals by Kaves are works of visual art which is viewed as meritorious, and recognized by art experts, art community, and other cross-section of the community.

*Other Artworks in NYC by other Artists*

38.     New York City is also home to many other acclaimed artists. As recent as last year, 21 artists, including MeresOne, and their 45 artworks in the 5Pointz Project in Queens were deemed by this court (Hon. Frederic Block) to have recognized stature in the monumental 5Pointz decision (*Cohen et al. v. G&M Realty L.P.*, No. 13-cv-5612, ECF No. 172; *Castillo et al.v. G&M Realty L.P.*, No. 15-cv-3230, ECF No. 101 (E.D.N.Y. 2018)), which was affirmed by the Second Circuit (*Cohen et al. v. G&M Realty L.P.* (CON), *Castillo v. G&M Realty L.P.* (L), No. 18-cv-498 (2d Cir. 2020)).  Those artists – and countless others based and active in NYC – have created and continue to create numerous murals that are spread around the city, many of which, upon information and belief, have obtained recognized stature within the meaning of the VARA.

39.     Upon information and belief, street art and graffiti have become a well-appreciated art genre that is highly valued in the art market. Graffiti and street art of all kinds and sizes are sold and licensed at quantifiable monetary value. The destruction, modification, and mutilation of

those artworks without notification has created monetary loss to artists who were unable to salvage their art, and have lost property interest in licensing, selling, and loss of professional reputation.

40.     Artworks of such quality, merit, and prestige are numerous, ascertainable, and can be proven through a mechanism that can be established in this case for the benefit of individual class members for determining recognized stature, calculating damages and loss.

41.     New York City's tourism industry generates $68 Billion or more per year, which is 10 times more than the local tax revenue.

42.     New York City is home to many of the world's most famous street artists, who contribute valuable works of art on the urban landscape. The City capitalizes on the scores of tourists who seek out street art in New York City all year round. In particular, New York City's official tourism website (www.nycgo.com) denotes the value of murals in Brooklyn's Bedford-Stuyvesant neighborhood to tourists as follows:

> The neighborhood murals that immortalize these civil rights figures and music icons . . . create a distinct aesthetic . . . This combination of history, community and bustle makes Bed-Stuy worth exploring over a long weekend; a visit can also provide much-needed support to Black-owned businesses that have been disproportionately impacted by the pandemic.[8]

43.     On its "NYC The Official Guide" website, the City also touts world-class street art tours as part of its menu of options for tourists, which range from $20-$50 per tourist, including the following:

---

[8] *A Weekend Exploring Black-Owned Bedford-Stuyvesant*, NYC THE OFFICIAL GUIDE (Jan 12, 2021), https://www.nycgo.com/articles/black-owned-bed-stuy-itinerary)

    a.  "Graffiti Tour of Bushwick"[9]

    b.  "Brooklyn Street Art Walking Tour"[10]

    c.  "Insider Art Tour of Bushwick Brooklyn"[11]

    d.  "Brooklyn Street Art Bike Tour"[12]

    e.  "NYC: Private Graffiti & Street Art Walking Tour"[13]

44.    Upon information and belief, the City of New York knows that it is benefitting aesthetically and economically from the presence of street art in the urban landscape and engages in the promotion of certain street artworks, but not others.

*About the NYPD "Graffiti Cleanup Campaign"*

45.    In the past year, protesters within the City of New York have sought to "defund" the police. Such messages made their ways on public spaces and walls.

46.    According to media reports, NYPD has taken a heightened stance against graffiti messages that have an anti-police sentiment.[14] According to media reports, in April 2021, NYPD stated that citizens who participated in protests against police violence and wrote "Stop Killing Black People" inside a heart shape were "wanted for graffiti and criminal mischief."[15]

---

[9] *Graffiti Tour of Bushwick*, NYC THE OFFICIAL GUIDE, https://www.nycgo.com/tours/graffiti-tour-of-bushwick/
[10] *Brooklyn Street Art Walking Tour*, NYC THE OFFICIAL GUIDE, https://www.nycgo.com/tours/brooklyn-street-art-walking-tour/
[11] *Insider Art Tour of Bushwick Brooklyn*, NYC THE OFFICIAL GUIDE, https://www.nycgo.com/tours/insider-art-tour-of-bushwick-brooklyn/
[12] *Brooklyn Street Art Bike Tour*, NYC THE OFFICIAL GUIDE, https://www.nycgo.com/tours/brooklyn-giro-bike-tours-brooklyn-street-art-bike-tour/
[13] *NYC: Private Graffiti & Street Art Walking Tour*, NYC THE OFFICIAL GUIDE, https://www.nycgo.com/tours/brooklyn-unplugged-tours-nyc-private-graffiti-street-art-walking-tour/
[14] Greg Norman, *NYC Police Union Warns about Graffiti Calling for 'more dead cops*, FOX NEWS (July 2, 2020), https://www.foxnews.com/us/nyc-police-union-issues-graffiti-warning
[15] Celona & Meyer, *BLM Protesters leave a Trial of Anti-Cop Graffiti in Manhattan*, NY POST (April 4, 2021), https://nypost.com/2021/04/04/blm-protesters-leave-trail-of-anti-cop-graffiti-in-manhattan/

47.     In March 2020, New York City cut the budget for the graffiti removal program.[16]

48.     On or about March 3, 2021, NYPD's Commissioner announced its plan to revive efforts to "clean up graffiti" using untrained police officers and unpaid so-called volunteers, even though the City had suspended the program and budget. NYPD's Commissioner was quoted in one media outlet where he expressed, "We think it's a great opportunity to continue to build trust and relationships in New York City."[17]

49.     NYPD launched its graffiti attack campaign on April 10, 2021.

50.     Upon information and belief, on or about April 10, 2021, the NYPD 84th Precinct Officers destroyed Kaves' Mural, "Death from Above" by painting over it with grey paint.



**Twitter, @NYPD84Pct (April 10, 2021)**

---

[16] Honan & Jones, *New York City Businesses Fret as Graffiti-Removal Program is Axed*, WALL STREET JOURNAL (July 19, 2020), https://www.wsj.com/articles/new-york-city-businesses-fret-as-graffiti-removal-program-is-axed-11595178000; NYC 311, https://portal.311.nyc.gov/article/?kanumber=KA-02070
[17] Fenton & Woods, NYPD launches new graffiti clean-up initiative, NY POST (March 3, 2021), https://nypost.com/2021/03/03/nypd-launches-new-graffiti-clean-up-initiative/

51.     Upon information and belief, Defendants did not ask the property owner, tenant, nor the artist Kaves whether the Mural was authorized by the property owner.

52.     Upon information and belief, Defendants did not provide any prior notification to the artist Kaves, the property owner, nor the tenant before the NYPD destroyed the Mural.

53.     The artist Kaves, the property owner, the tenant of the property, and many community members were shocked and enraged by the NYPD's attack on the Mural which had been appreciated and preserved by the community for more than 13 years since its creation, and had become a community landmark.

54.     Upon information and belief, NYPD lacks a clear procedure, training, or protocol to determine which works of art are protected under the Visual Artists Rights Act, or even to distinguish between art and vandalism.

55.     Moreover, upon information and belief, NYPD does not even have a protocol in place to confirm with property owners whether the murals and artworks were created with permission. This also means that the NYPD lack a clear directive on how to instruct their police officers and so-called volunteers how to properly discern "vandalism."

56.     Social media commentators encountering news about NYPD's attack on the Mural wrote that the deletion was motivated by "political propaganda," "bureaucracy" and "ignorance."

57.     In NYC's own publication entitled "Combating Graffiti," NYPD provides a terse definition of "Street Graffiti" which fails to make any distinction between vandalism and murals that are authorized by property owners and/or protected under the Visual Artists Rights Act. That publication states, in general terms, "Graffiti is a Crime."[18]

_____

[18] Combating Graffiti "Reclaiming the Public Spaces of New York," City of New York Police Department, available

58.     NYPD has created an interactive map showing more than 166 sites of art installations where they have "cleaned up graffiti across NYC," according to a Tweet by NYPD Commissioner.[19]

59.     Upon information and belief, the NYPD's graffiti cleanup campaign is planned to run for the entire summer of 2021.[20]

60.     Upon information and belief, many artworks of Kaves and those that are similarly situated have been and will continue to be attacked by NYPD, regardless of whether the artworks were authorized, long-standing, recognized, and/or protected by the Visual Artists Rights Act.

61.     Upon information and belief, many artists will be chilled from expressing their beliefs and opinions about the NYPD or express sentiments about defunding the police, or in support of protesters that stand against police abuse of power due to the selective hostility and destruction of such messages by the NYPD in the City.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of a Class of individuals who have installed artworks with permission from the property owners or operators within the City of New York, whose artworks have been, or may in the future be destroyed, mutilated, or distorted by the NYPD.

---

at http://www.nyc.gov/html/nypd/downloads/pdf/anti_graffiti/Combating_Graffiti.pdf
[19] NYPD Graffiti Clean Up Interactive Map (ARC GIS):
https://nypd.maps.arcgis.com/apps/instant/attachmentviewer/index.html?appid=e2b55bdc48a4410bb0ef6d5364854f56
[20] Cleanup Time: NYPD, Shea head up big blitz in Brooklyn and beyond to wipe out graffiti (April 10, 2021), AMNY,
https://www.amny.com/news/graffiti-cleanup-time-for-nypd-shea-in-brooklyn/

*__FRCP 23(a)__*

63.    Plaintiff is a member of the Class he seeks to represent.

64.    The members of the Class herein, believed to number in the hundreds, are so numerous that joinder of all members is impracticable.

65.    In addition, joinder is impracticable because, upon information and belief, many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many class members who have been victimized by Defendants' unconstitutional policies and practices may not bring individual claims. There is no adequate avenue for the protection of the class members' constitutional rights other than a class action.

66.    There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

a.   Whether the NYPD destroyed, mutilated, modified, or otherwise distorted artworks by class members;

b.   Whether the NYPD's practice of destroying street murals without notice to the artists who have gained recognized standing violated the Visual Artists Rights Act;

c.   Whether the NYPD's mutilation, modification, or otherwise distortion of the artworks by class members violated the Visual Artists Rights Act;

d.   Whether the NYPD's policy, process, practice, or custom arbitrarily limited speech and expression of a target group and based on content;

e.   Whether the NYPD's lack of procedure and training in examining the artistic merit of the art, permission from the property owner in the

installation of the art, and artists' rights to the art amount to an infringement of property rights without due process of the law;

f.   Whether the NYPD's conduct was willful and/or reckless;

g.   Whether the NYPD's destruction, mutilation, modification, and/or distortion of the artworks resulted loss recoverable through actual or statutory damages under Copyright Act and 24 U.S.C §§ 1983 & 1988;

h.   Whether the NYPD's actions are unlawful and entitle Plaintiff's Class to declaratory and injunctive relief.

67.   Plaintiff and Class members reserve the right to revise and amend the questions of law and fact at a later time as more facts are gained in discovery.

68.   The legal claims for which the named Plaintiff seeks declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the named Plaintiff are typical of the harms suffered by all Class members and/or the mechanism and expertise for determining harm for individual damages are typical of those of class members.

69.   The representative Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Named Plaintiff has a strong personal interest in the outcome of this action, and has no known conflicts of interest with members of the plaintiff class. Plaintiff and his artworks reside in the New York area, where Defendants' unconstitutional policies, practices and customs are implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs.

70.   Plaintiff has retained counsel competent and experienced in class actions, art litigation, civil rights litigation, and the intersection thereof. Counsel for Plaintiff has the resources,

expertise, and experience to prosecute this action. Counsel for Plaintiff know of no conflicts among members of the Class or between the attorneys and members of the Class.

### *FRCP 23(b)(2)*

71.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because NYPD has acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief with respect to Plaintiff and the Class as a whole appropriate. The Class members are entitled to injunctive relief to end Defendants' arbitrary and unlawful policies and practices.

### *FRCP (23)(b)(3)*

72.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

73.     The Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and arbitrary policies and practices. Class members will be able to show entitlement to damages and compensation (*i.e.* recognized stature, actual and statutory loss) collectively, or in the alternative, individually, through a common mechanism set forth through the class mechanism, which is superior and expedient compared to bringing individual claims, for the fair and efficient adjudication of this litigation.

74.     The appropriate level of punitive damages is based on Defendants' conduct, making these issues common to the Class.

### *FRCP 23(c)(4) Alternatively Pled*

75.     As an alternative to pleadings under FRCP 23(b)(2) and 23(b)(3), Plaintiff seeks an

order from this court under FRCP 23(c)(4) certifying particular issues common to all putative class members including, but not limited to:

      a.   Whether the Defendants' arbitrary policy and practices violate VARA and the Constitution;

      b.   Whether the class members' artworks are works of visual art;

      c.   Whether the class members' works were destroyed or mutilated;

      d.   Whether the class members works are at risk of destruction or mutilation;

      e.   Whether the Defendants' conduct was willful and reckless.

<u>**CLAIM I:**</u>
**VIOLATION OF THE VISUAL ARTISTS RIGHTS ACT (17 U.S.C. §106A)**
**(On behalf of Plaintiff and the Class)**

76.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

77.    This Claim is brought by Plaintiff on behalf of himself and the Class of similarly situated individuals that he represents.

78.    At all times relevant to this action, The Visual Artists Rights Act (VARA) has been in effect.

79.    Plaintiff's Death from Above is a work of visual art within the meaning of 17 U.S.C. §101 and constitutes copyrightable subject matter.

80.    Plaintiff's work of visual art, Death from Above, was installed in or about 2008.

81.    Plaintiff created and maintained all ownership and copyright interests in the Mural Death from Above, and installed those works on private property with permission from the owner and tenant of the property.

82.    Plaintiff's work of visual art, Death from Above, was installed without any fixed

period of duration, had been maintained for 13 years, and was intended to last indefinitely.

83.    Plaintiff's work of visual art, Death from Above, was destroyed, distorted, mutilated and/or modified by Defendants.

84.    Plaintiff's work of visual art was a work of Recognized Stature. The Mural was recognized for its merit and has been recognized by art experts, art community, and a cross section of the public. It has been on exhibit for years and has been the subject of innumerable news articles and TV shows, reviews by other artists and art curators, and featured on countless social media posts belonging to cross sections of the public.

85.    Without providing Plaintiff with a reasonable opportunity to protect and preserve his artworks, Defendants destroyed, mutilated, modified and defaced the works of art installed by Plaintiff.

86.    Defendants did not provide Plaintiff with notice in writing regarding their intent to destroy the artwork nor did they afford Plaintiff, pursuant to 17 U.S.C. § 113, a period of 90 days after receiving such notice either to remove the work or to pay for its removal.

87.    Plaintiff has not executed nor signed a written instrument that specifies that installation, Death from Above, may be subject to destruction, distortion, mutilation, or other modification by Defendants for any reason, including removal.

88.    The destruction, distortion, mutilation, and/or modification of Plaintiff's Mural occurred in a manner prejudicial to Plaintiff's honor and/or reputation, and causing him substantial harm in this regard.

89.    Defendants' actions were willful, wanton and malicious.

90.    Without injunctive relief, there is a clear risk that Defendants' actions will recur with Plaintiff or other similarly situated artists. Plaintiff is thus entitled to injunctive relief and

declaratory judgment.

91.     Plaintiff incurred significant financial losses as a result of the wanton destruction

of his valuable works of art.

92.     Plaintiff is thus entitled to compensatory (actual and/or statutory damages) and

punitive damages for the injuries and loss sustained as a result of Defendants' conduct.

93.     Plaintiff is further entitled to an award of attorney's fees, expert fees, and other

costs under 17 U.S.C. §505.

<u>**CLAIM II:**</u>
**DEPRIVATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983) VIOLATION OF
FREE SPEECH & DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS
(On Behalf of Plaintiff and the Class)**

94.     Plaintiff repeats and realleges all preceding paragraphs in support of the claim.

95.     This Claim is brought by Plaintiff on behalf of himself and the Class he represents.

96.     Defendants, acting under pretense and color of state law and in their individual and

official capacities and within the scope of their employment, have deprived and will continue to

deprive Plaintiff and each and every member of the Plaintiff Class of rights, remedies, privileges

and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed

by the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

97.     At all relevant times herein, Defendants established and/or followed policies,

procedures, customs, and or practices that illegally destroyed or mutilated artworks and

inconsistently applied arbitrary policies by police officers who were deliberately ignorant and

untrained as to artists' rights under the Constitution, Copyright Law, and VARA.

98.     Those arbitrary policies were the cause of violation of Plaintiff's and the class

members' constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the case of

*Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978), including those under the

First and Fourteenth Amendments.

99.     As a direct and proximate result of the misconduct and abuse of authority described above, Plaintiff and each and every member of the Plaintiff Class will be deterred and chilled from freely expressing their messages and speech through murals, aerosol art, street and graffiti art. That their artworks can be removed, mutilated, modified, or destroyed arbitrarily and without any notice by the police, their messages silenced, and their reputations minimized, their artworks treated like litter that needs to be "cleaned up" will discourage artists from creating artwork, exercising free speech and expression.

100.     As copyright holders, Plaintiff and members of the Plaintiff Class have property interests in copyrighted work from which physical and digital licensing fees, professional and business reputation, and opportunities for sales and marketing of artworks are derived. The destruction, distortion, mutilation, modification of the artworks after labeling the artworks as "vandalism" or "illegal graffiti" results in deprivation of Plaintiff's property interests by Defendants without due process.

101.     Defendants breached their duties and obligations to Plaintiff and the Class by: (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with the Constitution and Federal laws; (3) inducing agents (community "volunteers") and police officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to Plaintiff and the Class by disregarding the numerous lawsuits and reports indicating that the removal of street art and murals without notification and examination into each artwork's creator, merit, ownership,

23

permission, recognized stature, and without proper training of the agents and police officers regarding the same, violated the Plaintiff's and Class' rights under the Constitution, Copyright Law, and VARA.

102. Defendants knew, or should have known, that by breaching the aforesaid duties and obligations, it was foreseeable that these choices would and did cause Plaintiff and the Class to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the arbitrary policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to Plaintiff and the Class.

103. As a direct and proximate result of the misconduct and abuse of authority described above, Plaintiff and each and every member of the Plaintiff Class have suffered and will continue to suffer injury and damages, including physical and mental pain, suffering, and mental anguish from the willful destruction of their works of art.

104. The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to Plaintiff and the Class as alleged herein and, as a result, Plaintiff and the Class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

105. Unless enjoined, Defendants' policies, practices and/or customs to arbitrarily remove art from streets -- without proper notification to artists, without investigation into the ownership of the artwork, property, and copyrights of the artwork, and without due regard to the legal rights of the artists in the artworks – will continue to subject Plaintiff and members of the Plaintiff Class to immediate and irreparable injury for which no adequate remedy at law exists in that members of the Plaintiff Class will suffer continued violations of their rights under the First

and Fourteenth Amendments to the United States Constitution.

106.    As set out above, injunctive relief is warranted to ensure that Defendants' actions will not recur with Plaintiff and members of Plaintiff Class.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief against Defendant:

A.    Certification of the case as a class action on behalf of the proposed Plaintiff Class;

B.    Designation of Representative Plaintiff Michael McLeer as representatives of the Class;

C.    Designation of Representative Plaintiff's Counsel of record as Class Counsel;

D.    A declaratory judgment that Defendants' practices complained of herein are unlawful and violate 42 U.S.C. § 1983 and 17 U.S.C. § 106A *et seq*.;

E.    A preliminary and permanent injunction against Defendants and their officers, agents, and any and all persons acting in concert with them from engaging in destruction, modification, mutilation, and distortion of street art and a full stop of the "graffiti clean up" operation;

F.    As preliminary and permanent injunction against Defendants and their officers, agents, and any and all persons acting in concert with them from engaging in policies, patterns, and/or practices that deprive Plaintiff's and the Class' Constitutional rights and rights under Copyright Law and VARA,

G.    An order from this court to review and revise the Defendants' policies as to cleaning up murals in the city by notice and public hearing of all members of the community including artists;

H.     All damages sustained as a result of Defendants' conduct, including but not limited to damages for emotional distress, loss of property interest, loss of professional and personal reputation, loss of opportunities to express oneself in chosen artistic medium;

I.     Exemplary and punitive damages for willful, knowing, and wanton conduct;

J.     Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

K.     Pre-judgment and post-judgment interest, as provided by law; and

L.     Such other legal and equitable relief as this Court deems necessary, just, and proper.


Dated: June 1, 2021

Respectfully Submitted,

By:

__/s/ Juyoun Han_____

Juyoun Han, Esq.
Eric Baum, Esq.
Ayo Alston-Moore, Esq.
**Eisenberg & Baum LLP**
24 Union Square East, Penthouse
New York, NY 10003
212-353-8700 (tel.)
*Attorneys for Plaintiff*